FILLMORE LLC and Innotek, Inc.,
Appellants–Defendants,

v.

FILLMORE MACHINE & TOOL
COMPANY, Appellee–
Plaintiff.

No. 17A03–0207–CV–242.

Court of Appeals of Indiana.

Feb. 19, 2003.

Stephen L. Fink, Matthew M. Hohman, Barnes & Thornburg, Fort Wayne, IN, Attorneys for Appellants.

Laura L. Reuss, Beers, Mallers Backs & Salin, Fort Wayne, IN, David A. Gunter, Dean Mead, Viera, FL, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellants-defendants Fillmore LLC and Innotek, Inc. appeal the trial court's judgment in favor of the appellee-plaintiff Fillmore Machine & Tool Company (Fillmore). They claim that the trial court erred: (1) in not finding that an agreement existed for the sale of certain equipment and real estate by Fillmore to Fillmore LLC; (2) in concluding that the integration clause in a business operation agreement precluded a finding of other, unrelated contracts between Fillmore LLC and Fillmore; (3) in determining that the statute of frauds precluded the enforcement of an agreement for the sale of equipment and real estate by Fillmore to Fillmore LLC; (4) by finding that an agreement existed between Fillmore and Fillmore LLC, pursuant to which Fillmore LLC would manage Fillmore's business; (5) by failing to enter a monetary judgment in favor of Fillmore LLC in the amount it paid on behalf of Fillmore; and

(6) in its determination that Innotek and Fillmore LLC had committed civil conversion of Fillmore's business equipment. Concluding that the trial court properly found for Fillmore with respect to these issues, we affirm the judgment.

### FACTS

The facts most favorable to the judgment are that in 1989, Fillmore purchased certain real estate and manufacturing equipment in Fort Wayne for its production of various metal parts and tool and die molds. Greg Topper and Dale Kohlmeier each held a fifty percent interest in the corporate shares of stock in Fillmore.

Innotek operated a manufacturing business that produced a number of pet products and, on occasion, it purchased screws manufactured by Fillmore for use in its products. On September 6, 1997, Topper and Innotek's CEO, Mike Westrick, discussed the possibility of Innotek's purchase of Kohlmeier's 50% ownership interest in Fillmore. Kohlmeier desired to redeem his interest in the business so that he could raise cash for personal reasons. While Topper did not want to sell his interest in the company, he was interested in going into business with Innotek and remaining as an employee.

Thereafter, an Innotek employee, Kinnie Moon, along with Topper, and Innotek's accountant, Bruce Buchan, met to discuss a transaction whereby Kohlmeier's 50% ownership in Fillmore was to be acquired by Inntotek. In anticipation of a sale, Fillmore furnished financial information regarding the company as well as personal and business tax returns for review. At the September 6 meeting, Buchan made several suggestions regarding ways in which the proposed transaction might be completed. One idea was for Fillmore and Innotek to form a limited liability company, whereby each company would own 50%

of the business. Fillmore would purchase Kohlmeier's stock in the corporation leaving Topper as the sole owner of Fillmore. It was also discussed that Fillmore LLC would manage the company's business operations.

A deal had apparently been struck regarding the sale, but Topper had not been supplied with copies of any of the closing documents before that meeting. Rather, the documents had been negotiated and exchanged over a period of time by and between the law firms that represented Innotek and Kohlmeier. Those documents had been drafted with input from only Moon, Buchan and legal counsel. When the closing took place on October 31, 1997, Topper learned for the first time that Kohlmeier's attorney, Ginger Mosier, would no longer be representing him. Topper testified that Mosier "had [Topper] sign a piece of paper saying that they would not be ... representing him and that [he] understood that they would not be [his] attorneys at this signing, or statements to that effect." Tr. p. 114. Thus, Topper had no independent legal counsel at the closing.

The closing documents consisted of a "Transfer and Sale Agreement," and "Operating Agreement for Fillmore, LLC" and an Employment Agreement between Fillmore LLC, and Kohlmeier, pursuant to which Kohlmeier was to become an employee of Fillmore LLC at a particular rate of pay. The transfer and sale agreement provided that Innotek and Fillmore had agreed to form Fillmore LLC, the company that would manufacture products that had been previously crafted by Fillmore. Additionally, Innotek was to contribute $24,000 in cash to Fillmore LLC in exchange for 50% of Fillmore LLC's units. Fillmore was to contribute $24,000 in accounts receivable to Fillmore LLC in exchange for the other 50% of Fillmore

LLC's units. The Operating Agreement contained numerous clauses relating to the management of Fillmore LLC, but also had attached to it, as Exhibit B, another memorialization of the capital contributions of the two members, showing that Innotek's contribution was $24,000 in cash and Fillmore's contribution was $24,000 in accounts receivable. There was no mention in these documents regarding the transfer of equipment or any other asset to Fillmore LLC.

When Topper reviewed the closing documents, he sought assurances that Fillmore would only lose its 50% ownership interest in the LLC if the buy-out occurred, and that its machinery and equipment would not be lost. Moellering, Innotek's legal counsel, told Topper that Fillmore would only lose its ownership interest in the LLC in the event of the buy-out. After reviewing the relevant paperwork and believing that he understood the terms of the deal, Topper executed the closing documents.

The integration clause of the Operating Agreement for Fillmore LLC that later became relevant to this litigation, provided as follows:

> 13.1 *Complete Agreement.* This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to its subject matter. This Agreement and the Articles replace and supercede [sic] all prior agreement by and among the members or any of them. This Agreement and the Articles supercede [sic] all prior written and oral statements and no representation, statement, or condition or warranty not contained in this Agreement or the Articles will be binding on the members or have any force or effect whatsoever.

Plaintiff's Ex. 3. Following the closing, Moellering mailed copies of the executed closing documents to Moon on behalf of

Innotek, and to Topper, on behalf of Fillmore. The letter accompanying the documents stated that:

> *FILLMORE, LLC OPERATION.* I understand that the employees of Fillmore Tool and Machine Co., Inc. ("Fillmore Tool") will be employed by Fillmore, LLC and that the equipment of Fillmore Tool will be leased for production purposes by Fillmore, LLC. We have suggested certain revisions to the employee handbook for Innotek, Inc. and we have suggested that a formal lease of the equipment be prepared and signed by the parties. However, I understand that no further action is to be taken by me with regard to these matters at this time.

Plaintiff's Ex. 4.

At some point after the closing, Moon, with Topper's approval, took control of Fillmore's checkbook and financial records. He also had accountants for Innotek and Fillmore LLC perform accounting tasks and income tax return preparation for Fillmore. Unbeknownst to Topper, Buchan, the accountant, used the two businesses' tax returns to show a transfer of Fillmore's equipment and real property to Fillmore LLC. Thus, in December 1998 and January 1999, representatives of Fillmore LLC moved the machinery and equipment from the Fort Wayne location to its newly leased premises at an industrial park located near Garrett, where it continued to use the machinery and equipment.

When questioned about the accounting entries and the tax returns showing a transfer of assets other than $24,000 in accounts receivable from Fillmore to Fillmore LLC, Buchan stated that he prepared the returns and made the entries to reflect his understanding of the parties' discussions at the September 1997 meeting. Buchan also acknowledged that before preparing the first tax return for Fillmore and Fillmore LLC, he discovered that the transfer and sale agreement and operating agreement reflected a different scenario—one in which Fillmore's contribution to Fillmore LLC was only $24,000 in accounts receivable—not any and all assets of the company. Buchan acknowledged that when he realized there was a discrepancy between the closing documents and his recollection of how the transaction was to be accomplished, he brought it to Moon's attention.

However, neither Moon or any other principal of Innotek, nor Buchan, ever had discussions with Topper regarding the discrepancy between the closing documents, tax returns and the potential consequences of those discrepancies. Similarly, no one advised Topper that Fillmore's equipment and other assets had been transferred or somehow sold to the LLC. In fact, Buchan never discussed the tax treatment of the transaction or the tax returns with Topper at all.

In May 1999, the principals at Innotek informed Topper that they wanted Topper and Fillmore removed from Fillmore LLC. During the course of those discussions, it was apparent that Topper still understood and believed, as had been expressed in the closing documents, that Fillmore still owned the machinery, equipment of the business and other assets it had owned prior to the October 31, 1997 closing. Innotek was concerned that Topper would remove the machinery and equipment from the business premises. Thus, Innotek's CEO ordered Topper's keys to be returned and that the locks to the premises be changed so that Topper could not remove the machinery and equipment or have free access to the premises. Innotek and Fillmore LLC never denied that they prevented Fillmore from having possession and control of the machinery and equip-

ment. Rather, both companies maintained that equipment and other assets were the property of Fillmore LLC.

On October 20, 1999, Fillmore's counsel made a formal demand to Fillmore LLC and Innotek for the relinquishment of the machinery and equipment. However, they failed to comply with that demand. Thus, on November 14, 1999, Fillmore filed a complaint against Innotek, alleging conversion of the manufacturing equipment. Fillmore sought damages and an injunction to compel Innotek's delivery of the equipment to Fillmore. Thereafter, Innotek filed a counterclaim against Fillmore, seeking a declaratory judgment that it was the rightful owner of the equipment and that it had had exercised a right to purchase Fillmore's partial ownership interest in Fillmore LLC. It also sought an injunction to compel the sale of the partial ownership interest in Fillmore LLC to Innotek.

At trial, the parties stipulated that the value of the equipment as of October 23, 1999, the approximate date of the alleged conversion, was $275,000. All involved in the matter agreed that there was never a written bill of sale or any other transfer document memorializing a purported agreement by Fillmore to transfer either the machinery and equipment or any real property to Fillmore LLC.

Following a bench trial that concluded on February 6, 2002, the trial court entered findings of fact and conclusions of law, stating that the October 31, 1997 operating agreement for Fillmore LLC was the complete and exclusive agreement of the parties. No oral agreements were reached and the operating agreement did not provide for the sale or other transfer of the machinery and equipment. Moreover, no oral or written lease existed with regard to the machinery and equipment. As a result, the trial court declared that

Fillmore was the rightful owner of the machinery and equipment. The trial court went on to determine, however, that Fillmore LLC and Innotek held a good faith belief that they could rightly refuse Fillmore's demand for the equipment. Thus, Fillmore's request for an award of damages for conversion was denied. It was also determined that Fillmore LLC and Innotek failed to prove that they properly exercised a legal right to purchase Fillmore's partial ownership interest in Fillmore LLC in accordance with the October 31, 1997 operating agreement. As a result, the request for the court to issue a declaratory judgment establishing and enforcing such a right to purchase was denied.

Thereafter, all parties filed a motion to correct error. The trial court determined that it erred in not finding that Fillmore LLC and Innotek had unlawfully converted the business machinery and equipment. Thus, Fillmore was granted judgment in the amount of $275,000 together with prejudgment and statutory interest. Fillmore was also awarded costs in the amount of $348.50. In all other respects, the motions to correct error were denied.

## DISCUSSION AND DECISION

### I. Standard of Review

In resolving the issues presented today, we initially observe that when a trial court has entered specific findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A), this court first determines whether the evidence supports the findings, and, second, whether the findings support the judgment. *Ahuja v. Lynco Ltd. Med. Research,* 675 N.E.2d 704, 707 (Ind.Ct.App.1996), *trans. denied.* If there are any reasonable inferences from the record to support the findings of the trial court, they will be affirmed on appeal.

*Capehart v. Capehart,* 705 N.E.2d 533, 536 (Ind.Ct.App.1999), *trans. denied.* Moreover, a judgment may be affirmed on any legal theory supported by the findings if that theory is consistent with all of the trial court's findings of fact and the inferences reasonably drawn from the findings, and if the court on appeal deems such decision prudent in light of the evidence presented at trial and the arguments briefed on appeal. *Mitchell v. Mitchell,* 695 N.E.2d 920, 924 (Ind.1998). The burden is upon the party who challenges the trial court's decision to overcome the presumption that it considered all the evidence and properly applied the law to the record before it. *Pitman v. Pitman,* 721 N.E.2d 260, 264 (Ind.Ct.App.1999), *trans. denied.*

## II. *Fillmore LLC and Innotek's Claims*

### A. *Agreement Regarding Business Equipment and Real Estate*

■ Fillmore LLC and Innotek first argue that the trial court erred in refusing to find that an agreement existed regarding the transfer of the business equipment and real estate. Specifically, they urge that the trial court erred in its ultimate determination that Fillmore "is, and at all relevant times has been, the owner of the machinery and equipment in question; neither Fillmore LLC nor Innotek, Inc. have an ownership interest in the machinery and equipment." Appellants' App. p. 21.

There is no dispute that Fillmore owned the subject equipment and real estate prior to the October 1997 transaction. Tr. p. 97, 99. There is no evidence in the record demonstrating that a written agreement regarding transfer of the equipment or real estate existed between Fillmore, Fillmore LLC, or Innotek. Additionally, there was no evidence that any unwritten agreement existed.

At trial, Topper testified that the purpose of the discussions that took place on September 6, 1997, was to, more or less, "brainstorm" different ways in which a transaction between the parties could be structured. Topper did not believe that any agreement had been reached as to how the proposed deal might be closed at the end of the September 1997 meeting. Moreover, he maintained that he did not believe that Fillmore had agreed to transfer its assets, including the equipment and real estate to an LLC or to Innotek. Tr. p. 174, 178–79. Topper also acknowledged that at no time did Moon, Fillmore LLC's manager, ever state that the company desired to acquire the equipment or the real estate. Tr. p. 119, 124.

In contrast, the record shows that the only individual who testified that an agreement was made for Fillmore to transfer its assets to the LLC was Bruce Buchan, Innotek's accountant and, notably, not a party to the alleged "agreement." Neither Moon, Innotek's Vice President and Fillmore LLC's Manager, nor Mike Westrick, Innotek's President, nor any other officer or director of either Fillmore LLC or Innotek, were called by Innotek or Fillmore LLC to testify at trial as to the alleged "agreement." Accordingly, the trial court was correct in concluding that there was no meeting of the minds as to a transfer of assets by Fillmore Machine to Fillmore LLC arrived at during the September 6, 1997 meeting.

Additionally, the trial court found that there was no reliable or credible evidence to support any agreement that Fillmore would transfer its equipment and real estate to Fillmore LLC. First, Topper testified that at no time did Moon, the LLC's manager, ever state that the LLC desired to acquire the equipment or the real estate. Tr. p. 119, 124. Topper also testified that at no time did he, as the sole

existing shareholder of Fillmore Machine, believe that he had ever agreed to transfer anything to Fillmore LLC other than $24,000 in accounts receivable. Tr. p. 16.

Be that as it may, Fillmore LLC and Innotek also contend that Topper's acceptance of an "offer" to purchase 50% of Fillmore's equipment was evidenced by his conduct. Specifically, Fillmore LLC and Innotek argue that Topper's consent to Moon's eventual takeover of the payment of Fillmore's expenses demonstrates Topper's consent to a transfer of the equipment and real estate to Fillmore LLC. Contrary to this claim, however, Topper testified that Moon offered to take over payment of the expenses and other administrative duties to alleviate the paperwork burden on Topper and to avoid wasting time. Topper did not believe that by permitting Moon and Fillmore LLC to act in this fashion supported any conclusion that was transferring property to Fillmore LLC. Tr. p. 185. To the contrary, Topper testified that he believed Fillmore's own money was being used to pay the debt and that Fillmore was paying an administrative fee for the service. Tr. p. 15.

■ Innotek and Fillmore LLC go on to argue that Topper's signature on one of Fillmore's tax returns demonstrated an agreement to transfer the equipment and real estate to Fillmore, LLC. Buchan, however, knew that the accounting records and tax returns did not reflect the agreement of the parties pursuant to the Operating Agreement and transfer and sale agreement, yet he accounted for the transaction as he wished. Tr. p. 109, 114. Buchan did notify Moon of the discrepancy; however, neither Buchan, Moon nor anyone else ever informed Topper of a discrepancy between the return and the closing documents that were executed. Moreover, he was not asked for his assent to any modifications to the transaction. Tr. p. 119–21, 123, 35, 110, 168.

In essence, Fillmore LLC and Innotek's arguments amount to requests that Fillmore should be held to have agreed to such a transfer of equipment even though it had never been consulted with regard to such a prospect. In our view, it is apparent that they are trying to convince this court that if an accountant describes a transaction on tax returns in a manner which is inconsistent with the documents that have been executed by the parties, and is also able to convince the taxpayer to sign the tax return, even without explaining to the taxpayer the discrepancy between the tax returns and the transactional documents, then the tax return treatment of the transaction supersedes the written agreements and must control. We reject such a contention. Moreover, the trial court determined that no agreement existed between the parties that required Fillmore to transfer its equipment and real estate to Fillmore LLC. As set forth above, such a determination was based on the evidence contained in the record. It is apparent that the trial court weighed the evidence and judged the credibility of the witnesses at trial. As a result, the evidence supports the trial court's findings and the findings support the judgment with respect to any alleged agreement regarding the transfer of the business equipment and real estate. Thus, we decline to disturb that judgment.

### B. Trial Court's Reliance on Integration Clause in Contract

■ Innotek and Fillmore LLC next argue that the trial court improperly relied on the integration clause in the operating agreement to exclude evidence of an agreement between the parties regarding the equipment and real estate. Specifical-

ly, they allege that the trial court's determination that Fillmore LLC's payment of amounts due on the real estate and equipment must have been voluntary because the integration clause precluded other agreements was "clear error because the integration clause is specifically limited to its subject matter." Appellants' Br. pp. 18–19. Fillmore LLC and Innotek go on to assert that the operating agreement did not address all circumstances and transactions in which the business would engage and, therefore, the integration clause is not dispositive of this issue.

In addressing this contention, we note that, contrary to the claim advanced by Innotek and Fillmore LLC, the trial court did not state in its findings that the integration clause prevented the existence of an agreement with respect to the equipment and real estate. Rather, the findings with respect to this issue merely found that no such agreement existed and that if one existed, it would be barred by the integration clause. The trial court specifically determined as follows:

> 39. There exist no oral agreements between the parties either prior or subsequent to the October 31, 1997 closing documents and even if there were then any such agreements were and are revoked by or subsumed by the October 31, 1997 written agreements of the parties.

Appellants' App. p. 19. Here, the trial court found that no agreement existed—it did not determine that the integration clause excluded evidence of a particular agreement. The trial court made reference to the integration clause as well as the parol evidence rule in its findings because the theory at trial had been that the parties, by their conduct, were acting on an agreement that had been reached with respect to the real estate and equipment during the September 6, 1997 meeting in-

volving Topper, Kohlmeier, Moon and Buchan.

Innotek and Fillmore LLC argued at trial that the parties arrived at an agreement on September 6, 1997, whereby Fillmore was going to transfer all of its assets and liabilities, including the equipment and real estate and the sum total of its accounts receivable, to Fillmore LLC. They maintained that the agreement was carried out despite the fact that the terms of the operating agreement called for a capital contribution of only $24,000 by Fillmore to Fillmore LLC and that the agreement—the one that included an obligation to transfer only $24,000 to the LLC—represented the only agreement between the parties and that any previous agreements were void. Thus, the trial court correctly assumed that the integration clause prohibited the existence of an agreement by Fillmore to transfer its equipment, real estate and accounts receivable to the LLC, inasmuch as such an agreement would reflect a previous agreement that had been testified to by Buchan. The provisions of the integration clause, however, made it clear that any previous agreement between the parties had been revoked or subsumed by the terms of the operating agreement.

In essence, the trial court found that there was no subsequent agreement, thereby making any reference to the integration clause, unnecessary. Second, the evidence supported the trial court's determination that the purported agreement that was presented at trial by Fillmore LLC and Innotek, would be revoked by or subsumed by the October 31, 1997 operating agreement. Thus, there was no error.

### C. The Statute of Frauds

■ Next, Fillmore LLC and Innotek contend that the trial court erred in determining that our statute of frauds, Indiana Code section 26–1–2–201(1), would pre-

clude any agreement regarding the transfer of the equipment to Fillmore LLC. Specifically, they argue that Topper's signature on Fillmore's income tax forms indicated that the equipment had been transferred and that this was enough to have satisfied the statute of frauds. Alternatively, Fillmore LLC and Innotek maintain that partial performance of an oral contract effectively removed the agreement from the statute of frauds requirement.

In resolving this issue, we first note the provisions of Indiana Code section 26–1–2–201(1):

> Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

Long ago, this court determined that the writing must specifically refer to a sale memorandum or other acknowledgment of a sale—oral testimony will not establish a connection between the writing and the parties' acknowledgment of sale. *Warner Sugar Ref. Co. v. Beyer Bros., Goshen,* 87 Ind.App. 644, 151 N.E. 739 (1926). Applying this holding to the circumstances here, it is apparent that the tax returns have not satisfied the writing requirement of the statute of frauds. Specifically, the tax returns do not mention or otherwise refer to any agreement or acknowledgment of the purported sale between Fillmore and Fillmore LLC. Moreover, the returns do not even refer to the existence of Fillmore LLC. As a result, the tax returns have not satisfied the statute of frauds requirement with respect to this alleged agreement.

Notwithstanding the above, however, Fillmore LLC and Innotek assert that partial performance saves the alleged unwritten agreement between the parties. Specifically, they argue that "Fillmore, LLC clearly performed" and that "Fillmore, LLC paid" and that "Fillmore, LLC had performed its obligations." Appellant's Br. p. 22. Be that as it may, Fillmore LLC and Innotek do not state that Topper, the sole shareholder of the company against which they are attempting to enforce an alleged unwritten agreement, ever did anything in furtherance of that purported agreement. To the extent that Topper permitted Fillmore LLC to assist in managing Fillmore, Topper testified that he believed Moon was assisting to alleviate paperwork and that Fillmore LLC was using Fillmore's money to pay its debts while using Fillmore's checking account. Topper further testified that the company paid a fee to Fillmore LLC to perform these tasks. There is simply no evidence that Topper acquiesced or otherwise participated in furtherance of the purported unwritten agreement transferring Fillmore's equipment and real estate to Fillmore, LLC. As a result, Innotek and Fillmore, LLC's argument with respect to the alleged "partial performance" must fail.

### D. Conversion

■ Fillmore LLC and Innotek next argue that the trial court erred in determining that Fillmore was entitled to damages for conversion. Specifically, they assert that the evidence failed to show that Fillmore LLC's possession of the equipment was unauthorized and that no evidence existed that Innotek ever possessed or controlled the equipment.

■■ Civil conversion has been defined as exerting dominion over another's property to the exclusion and in defiance of the owner's right, under an inconsistent claim of title. *Burras v. Canal Constr. & De-*

*sign Co.*, 470 N.E.2d 1362, 1368 (Ind.Ct. App.1984). Additionally, unlike in a criminal trial, the plaintiff bringing an action under the civil conversion statute, Indiana Code section 34–24–3–1, need only prove by a preponderance of the evidence that the defendant committed the criminal act. *Gilliana v. Paniaguas*, 708 N.E.2d 895, 899 (Ind.Ct.App.1999), *trans. denied.* Hence, a criminal conviction for conversion is not a condition precedent to recovery in a civil action for conversion. *Kopis v. Savage*, 498 N.E.2d 1266, 1270 (Ind.Ct. App.1986). Further, in accordance with Indiana Code section 34–24–3–1, the trial court is authorized to award an amount not to exceed three times the actual damages of the person suffering the loss.

In the instant case, the trial court determined that Fillmore had, at all times, been the owner of the equipment and that in 1998 Fillmore LLC took possession of the equipment. The trial court found, and the evidence supported the finding, that Westrick, the other 50% owner of Fillmore LLC, had all the locks changed to secure the machinery and equipment from Topper. Tr. p. 127–28. Westrick also ordered that Topper was not permitted to be alone in the facility in order to prevent him from removing the equipment. Moreover, a demand letter was sent to Fillmore LLC and Innotek. Neither entity, however, would permit the return of the equipment to Fillmore. The evidence presented at trial demonstrated that both Innotek and Fillmore LLC engaged in civil conversion, the determination was not contrary to law. Thus, we decline to disturb the judgment.

### E. Mistaken Payments to Fillmore Machine

■ Innotek and Fillmore LLC next contend that the trial court should have awarded Fillmore LLC a judgment that represented certain payments that were mistakenly made to Fillmore. Thus, it is requested that we order the trial court to enter a judgment in favor of Fillmore LLC in the amount of $289,923, which represents the payments that Fillmore LLC purportedly made on Fillmore's behalf regarding the business machines and equipment.

■ In resolving this issue, we note that a party is generally precluded from raising an issue for the first time in a motion to correct error or on appeal. *Yater v. Hancock County Bd. of Health*, 677 N.E.2d 526, 530 (Ind.Ct.App.1997). Additionally, the crucial factor in determining whether the appellant may inject what appears to be a new issue into the appeal is whether the appellee had unequivocal notice of the existence of the issue and, therefore, had an opportunity to defend against it. *United Farm Bureau Mut. Ins. Co. v. Lowe*, 583 N.E.2d 164, 168 (Ind.Ct.App.1991).

Here, the judgment that Innotek and Fillmore LLC are requesting was not presented in the counterclaim, nor in any third-party complaint. Appellee's App. p. 1, 8. Additionally, no request for any set-off was alleged as an affirmative defense in the Answer, and the parties agreed pretrial order did not make any reference to the issue of a judgment for mistaken payments in favor of Innotek or Fillmore LLC. Appellee's App. p. 1, 14. The issue was not raised at trial and it was not presented in the proposed findings of fact and conclusions of law. Because Fillmore LLC and Innotek failed to request a judgment from the trial court for any alleged mistaken payments in a timely fashion, they have waived the issue on appeal and their claim for any "mistaken" payments must fail.

■ Waiver notwithstanding, we note that Innotek and Fillmore LLC's argument must fail for the reason that Fillmore

LLC would be unjustly enriched if it received the benefit and use of the business machines without paying rent or any amount for the ordinary wear and tear on the equipment. Such a result would be unjust in the event that Fillmore was obligated to pay a judgment with regard to the equipment. Therefore, the trial court properly denied Fillmore LLC's request for damages.

*F. Existence of Management Agreement*

██ Finally, Innotek and Fillmore LLC attack the trial court's determination that an agreement existed between Fillmore LLC and Fillmore regarding the management of Fillmore's business. Specifically, they argue that there was simply no evidence to support the existence of such an agreement, whereas "ample evidence exists regarding the transfer of the equipment and real estate." Appellants' Br. p. 24.

Contrary to these contentions, evidence was offered at trial establishing that a management agreement existed between Fillmore and Fillmore LLC. As set forth in the *FACTS*, Moon suggested to Topper that he permit Moon to manage the financial and business affairs of the company. Topper acquiesced, and testified that he paid a fee for the service. As a result, the trial court could properly determine that such an agreement existed, and there was no error with respect to this issue.

### CONCLUSION

In light of the disposition of the issues set forth above, we conclude that Innotek and Fillmore LLC have failed to demonstrate that the trial court's findings and conclusions are not supported by the evidence or that the judgment is contrary to law. In light of the issues set forth above, we conclude that the trial court properly determined that no agreement existed re-garding the transfer of the business equipment and real estate. We also note that the trial court properly relied upon the integration clause set forth in the contract and was correct in concluding that the statute of frauds precluded the finding of any agreement regarding the transfer of the equipment. Additionally, the evidence was sufficient to support the trial court's judgment that Fillmore LLC and Innotek were liable for conversion. Finally, we note that the trial court correctly determined that Fillmore LLC and Innotek were not entitled to receive any alleged "mistaken" payments they may have paid on Fillmore's behalf and that the evidence was sufficient for the trial court to have found the existence of a management agreement between Fillmore and Fillmore LLC.

Judgment affirmed.

RILEY, J., and MATHIAS, J., concur.